**WO**

JDN

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dale Gardner, | No. CV-23-08078-PCT-GMS (CDB) |
| Plaintiff, | |
| vs. | **ORDER** |
| City of Bullhead City, et al., | |
| Defendants. | |

Pending before the Court are: (1) Defendants Tempe Emergency Physicians, Micheal Treiman, and Andrea Vasquez's Motion for Summary Judgment (Doc. 142); (2) Defendants Bullhead City Police Department, Bullhead City, Estrellita Sandoval, and Sean Watson's Motion in Limine (Doc. 144); (3) Defendant Bullhead City Hospital Corporation's Motion for Summary Judgment (Doc. 145); and (4) Defendants Bullhead City Police Department, Bullhead City, Estrellita Sandoval, and Sean Watson's Motion for Summary Judgment (Doc. 147).

For the reasons set forth below, the Court grants Defendants Tempe Emergency Physicians Motion for Summary Judgment (Doc. 142), and Defendant Bullhead City Hospital Corporation's Motion for Summary Judgment (Doc. 145), grants in part and denies in part Defendants Bullhead City, Bullhead City Police Department[1], Watson, and

---

[1] The parties agree that Bullhead City Police Department is not a proper Defendant. To clear up any confusion and to correct the docket in this matter, which lists Bullhead City Police Department as a Defendant, the Court will grant the request to dismiss Bullhead City Police Department as a Defendant.

Sandoval's Motion for Summary Judgment (Doc 147), and denies the Motion in Limine (Doc. 144) without prejudice.

## I.    Background[2]

On May 12, 2022, just before 11:00 a.m., the Las Vegas Metro Police Department responded to a 9-1-1 call reporting that a "male looks distraught and looks like he is going to jump" from the Laughlin bridge. (Doc. 161-1 at 2.)  The Plaintiff's Decedent, Jesse Gardner, threw his belongings into the river, and then he jumped off the bridge. (*Id.* at 3; Doc. 161-1 at 2.)

Las Vegas Metro Police Officer Jeter  reported that a male was swimming over to the dock. (Doc. 161 at 15 ¶ 6; Doc. 161-1 at 2.)  Jesse swam over towards Jeter and got out of the water; Jesse told Officer Jeter that he was just cliff jumping. (Doc. 161 at 15 ¶ 6; Doc. 161-1 at 3.)  Jesse was cooperating and sitting on the ground when, after a few minutes, he suddenly stood up, ran down the dock, stated that the world would be better without him, and jumped in the water. (Doc. 161 at 15 ¶ 8; Doc. 161-1 at 3; Doc. 161-1 at 15, Jeter Dep. 32:7–18.)  Officer Jeter reported that Jesse was making no effort to swim and was floating down the river. (Doc. 161-1 at 3.)

A Clark County Fire Department Boat arrived on the scene; however, Jesse refused to get into the boat and said he would fight with anyone attempting a rescue. (Doc. 161 at 15 ¶ 9; Doc. 161-1 at 11, Jeter Dep. 16: 21–17:1; Doc. 161-1 at 3.)  Jesse refused to grab hold of a catch pole that Officer Jeter, who was in the boat, was holding out for him and Jesse refused to grab a floating device. (Doc. 161-1 at 12, Jeter Dep. 18:9–15, 18:22–25.)  Eventually, Jesse stopped trying to come up and stay above water. (*Id.* 18:5–8.)  Officer

---

[2] In this case, there is video footage of the incidents giving rise to Plaintiff's claims. (*See* Doc. 152, Exs. 4–15, Videos.)  The Court considers the facts in the light depicted by the videos but still draws all inferences from the videos in Plaintiff's favor. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).

Jeter was finally able to get hold of Jesse, and he cuffed Jesse's wrist to secure him to the boat. (*Id.* 18:18–21, 19:13–23.)  Officer Jeter and boat personnel were unable to get Jesse into the boat because he was "pretty much dead weight," so the boat went into shallow water where two other officers walked into the water, uncuffed Jesse, and walked him to shore. (*Id.* 20:3–21:2.)

Officer Jeter filled out a Police Department form titled "Application for Emergency Admission of a Person in a Mental Health Crisis to a Mental Health Facility or Hospital," which is referred to as an "L2K." (Doc. 161 at 16 ¶ 17; Doc. 161-3 at 91.)  This form authorizes police officers to transport an individual for mental evaluation. (Doc. 161-1 at 13, Jeter Dep. 23:18–23.)  On the L2K form, Officer Jeter checked a box indicating that Jesse attempted suicide, and he wrote that Jesse had been released from prison four days prior, that he jumped into the river from the Laughlin Bullhead City Bridge, and that "Jesse mentioned that he had nothing to live for and he wanted to die.  Jesse refused all help from rescue and LVMPD until he was to[o] tired to swim away." (Doc. 161-3 at 91.)

Jesse was transported by an American Medical Response ambulance to WARMC— Western Arizona Medical Center.  (Doc. 161 at 16 ¶ 14.)  Ambulance personnel documented that Jesse was on an "involuntary" psychiatric hold.  (Doc. 161-3 at 89.)  Ambulance personnel also completed a Patient Care Report form documenting that upon their arrival to the scene, Jesse was restrained to a gurney, "pt [patient] jumped in river and tried to hurt himself . . . pt sts [states] he is off his meds and jumped in river to drown . . . pt taken out of truck and wheeled into hospital . . . was ambulatory to ER bed . . . report given to RN [registered nurse]." (*Id.* at 87.)

Jesse arrived at the emergency department around 1:00 p.m.  (Doc. 161-1 at 28.)  Jesse first saw a nurse, who documented that emergency service personnel stated Jesse was suicidal, but Jesse denied suicidal ideation.  (Doc. 155-1 at 31.)  The nurse noted Jesse's report that he was bi-polar, that he had been up for five days, and that he went into the water to help him sleep.  (*Id.*)  The nurse noted that a Metro police officer said he heard Jesse say he didn't think the world would miss him.  (*Id.*)  Jesse informed the nurse that he

was on speed.  (*Id.*)  The nurse assessed Jesse at "ESI [emergency severity index] Level 2," which is the second highest risk category—or "second worst level"—in the ESI system. (Doc. 155 ¶¶ 26–27; Doc. 155-1 at 31; Doc. 155-1 at 62, Treiman Dep. 74:21–75:9.)

At this time, an assessment called the "Columbia Suicide Risk Assessment" was conducted.  (Doc. 155-1 at 31.)  This assessment consists of three questions: (1) have you wished you were dead or could go to sleep and never wake up; (2) have you actually had any thoughts of killing yourself; and (3) have you ever done anything, started to do anything, or prepared to do anything to end your life.  (*Id.*)  The nurse documented that Jesse answered "no" to each question; however, the nurse documented:

> Highest Assessed Suicide Risk Level: High risk for suicide.  Provider notified; Michael Treiman MD Other High Risk interventions applied; pt present in only underwear pt w/o other clothing pt waiting in hall at nurses station d/t [due to] overcrowding of ed.

(*Id.*)[3]

Jesse was treated by Defendant Dr. Treiman, who noted on the "ED Physician Documentation" form that he medically screened Jesse from 1:02 to 1:09 p.m.  (Doc. 161-1 at 28.)  Dr. Treiman testified that he had a conversation with Jesse in the hallway where Jesse was sitting in a gurney.  (Doc. 155-1 at 47, Treiman Dep 15:12–14.)  Dr. Treiman also testified that, from the time he interviewed Jesse, he made the judgment that Jesse was not suicidal but that he would likely benefit from drug and alcohol treatment, which he offered, and Jesse accepted. (*Id.* at 45, Treiman Dep. 9:9–13.)  Dr. Treiman then instructed his secretary to try to find a placement for Jesse.  (*Id.* 9:12–13.)

At 2:00 p.m., a nurse noted that Jesse received a snack, tolerated a blood draw well, and agreed to go to Talus Harbor Psyche Facility, although Jesse still denied suicidal ideation.  (Doc. 155-1 at 32.)

At 3:06 p.m., Defendant Dr. Treiman ordered a drug screen and labs.  (Doc. 155-1 at 28.)  At 3:29 p.m., Dr. Treiman documented that Jesse presented to the emergency

---

[3] There is no indication in the medical records of what "Other High Risk interventions" were applied or the results of those interventions.

department with depression and that his prior diagnoses included bipolar disorder and depression. (*Id.* at 27.)  Dr. Treiman also documented the following:

> 35 Y/O MALE WITH PMHX [past medical history] OF BIPOLAR DISORDER PRESENTS TO THE ED VIA EMS WITH C/O [complaints of] DEPRESSION.  PT WAS USING METH TODAY AND JUMPED INTO THE RIVER.  THE POLICE W[ERE] THERE AND PT WAS PULLED OUT.  PT TOLD THE POLICE THAT HE WAS SICK OF LIVING AND WAS BROUGHT TO THE ED.  PT STATES THAT HE HAS SUICIDAL IDEATION BUT WOULD NOT COMMIT SUICIDE.

(*Id.*)  At 3:30 p.m., Dr. Treiman documented the results of an exam, which included examination of Jesse's abdomen, where he had a tattoo memorializing his sister with the date of her death—May 12—the same date of Dr. Treiman's exam. (*Id.*)  Another blood draw was done and sent to the lab per Dr. Treiman's order. (*Id.* at 33.)

At 6:21 p.m., a nurse noted that Jesse was in no acute distress, he was moved to a private room, and he was given a portable phone. (*Id.*)  Jesse was also provided a "sitter" when he was moved to a private room; sitters are employed by the hospital to watch patients who are deemed unsafe, and they watch patients to make sure they don't harm themselves. (Doc. 155 at 20 ¶¶ 63–64; Doc. 155-1 at 53, Treiman Dep. 40:6–8, 101:15–16; *see* Doc. 155-1 at 33 (med. records referring to the sitter's reports).)

At 7:10 p.m., the sitter reported on a walkie talkie that Jesse exited his room and was in the hall. (Doc. 155-1 at 33.)  Jesse later explained to Defendant Officer Watson that he had been asleep but then woke up and was paranoid; he did not have any clothes, he started panicking, and he wanted to leave. (Doc. 161-3 at 108; Doc. 152, Ex. 4, Video 13:55–14:4.)  A nurse documented that she approached Jesse and asked where he was going and tried to get him back into his room or calm him down, but Jesse headed towards the door. (Doc. 155-1 at 33.)  Security personnel and other nurses tried to talk to Jesse, but he became more anxious and started to head toward another door to exit, since the first door was for ambulances and would not open. (*Id.*)  Jesse panicked as nurses circled him and then he allegedly shoved a medical tech who stood in front of him when he went towards an emergency exit door, causing a minor scratch on her arm. (*Id.*; Doc. 161-3 at 108; Doc.

152, Ex. 4 Video 29:55–30:00, 30:43–31:36).  Nurses and security personnel then eased Jesse to the floor to secure him, and the police were called.  (Doc. 155-1 at 33.)

Around 7:18 p.m., Defendant Officer Watson arrived at the hospital.  (Doc. 152, Ex. 4, Video 4:48–4:55.)  Jesse, who was wearing only boxer shorts, was lying face down on the floor in front of an exit door with three hospital staff securing him; Officer Watson handcuffed Jesse, and he and a staff member helped Jesse up and walked him to a chair in the hallway.  (*Id.* 5:00–6:15.)

Defendant Officer Watson had his body cam on, and the video footage shows that Watson stayed with Jesse in the hallway until approximately 8:35 p.m., when he escorted Jesse to his truck.  (*Id.* 6:15–1:20:00.)

Right after Jesse sat down in the chair, a nurse approached and told Officer Watson that Jesse was found in the river, there was concern about Jesse potentially hurting himself, and Jesse had said "the world would be better without him, that he might commit suicide."  (*Id.* 7:08–7:20.)

A minute later, Defendant Dr. Treiman approached Defendant Officer Watson.  (*Id.* 8:21.)  Dr. Treiman told Officer Watson that Jesse jumped in the river, and that Jesse said he had done meth and wanted to swim in the water to cool off.  (*Id.* 8:35–8:48.)  Dr. Treiman stated he was about to discharge Jesse, but then Jesse said he was not suicidal, just a little depressed, and Jesse told him, "I thought about killing myself, but I haven't," and Jesse asked Dr. Treiman if he could get Jesse into rehab.  (*Id.* 8:48–8:56.)  Dr. Treiman said he responded, "let me try," and he told Officer Watson that he spent the last six hours trying to get Jesse into rehab, but failed.  (*Id.* 8:56–9:06.)  Dr. Treiman then started to tell Officer Watson what he heard about Jesse's attempt to leave and Jesse's abusive conduct toward the medical tech, at which point Jesse said he did not attack the medical tech, and Jesse asked that they watch the footage Dr. Treiman said they obtained from the hall cameras.  (*Id.* 9:10–9:30.)  After some debate about exactly what transpired, Jesse stated that he deals with mental health issues, he is bipolar, he has been up for five days, and he used methamphetamine three times, so his mind was a little whacked.  (*Id.* 10:52–11:04.)

When Jesse made a comment that hospital staff turned on him, Dr. Treiman sharply told him, "Look at you, you're all scuffed up and bloody, you did it to yourself. I didn't turn on you, I've been polite. I've been a gentleman this whole entire time." (*Id.* 11:23–11:33.) Dr. Treiman confirmed to Officer Watson that Jesse was "clear" for discharge. (11:50–11:54.)

The medical tech said she wanted to press charges, so Defendant Watson's partner, Defendant Officer Sandavol, got a statement from the medical tech and went to watch the hospital footage of the incident. (Doc. 148 ¶ 58.) Officer Sandavol interviewed the medical tech, who said that Jesse was in the emergency department because he went into the river, he has psych problems, and he was brought in to be evaluated. (Doc. 152, Ex. 7, Video 00:45–00:55.)

While Defendant Officer Watson and Jesse were in the hallway, they engaged in conversation, and, at one point, Jesse told Officer Watson, "If they're going to release me, I guess I'm suicidal and I need to go to an in-patient crisis bed." (Doc. 152, Ex. 4, Video 38:56–39:03.) Jesse later told Officer Watson, in response to Watson stating that people can die jumping off the very top of the bridge, that "that's where they took this the wrong way," and that he had been suicidal a few times this past week, but that if he would have died in the river, "oh . . . well, I died having a blast." (*Id.* 44:40–44:52.)

Defendant Officer Sandoval informed Officer Watson of the results of her interview with the medical tech. (*Id.* 29:06–30:35.) Officer Watson noted that the medical tech had no injuries, when asked if she wanted to prosecute, she said "sure," and Jesse was trying to leave the hospital at the time and he was entitled to leave; thus, Watson was unsure whether an arrest was warranted, so he instructed Officer Sandavol to call the on-call county attorney. (*Id.* 35:00–35:55, 36:47–36:59.) During the phone call, which occurred around 8:00 p.m., the on-call county attorney said that if there is documentation that Jesse had a serious mental illness, like bi-polar, then they should not pursue aggravated assault. (*Id.* 46:35–46:46.) Officer Watson responded, "we don't have any of that documentation today," and he stated that the hospital did not have documentation of a bi-polar or

schizophrenia diagnosis. (*Id.* 46:46–47:06.)  The county attorney and Officer Watson then agreed to go ahead and charge Jesse. (*Id.* 47:07–48:42.)

Jesse's belongings were in a bag on a chair in the hallway next to Defendant Officer Watson. (*Id.* 37:29–37:31.)  Officer Watson acknowledged the bag and accessed it once to show Jesse that his rings and stuff were in the bag. (*Id.* 41:23–41:38.)  The bag also contained paperwork from Southwest Behavioral Health that included Jesse's mental health information, but neither Watson nor Sandoval looked at the information. (Doc. 161 ¶¶ 69, 71.)

Defendant Officer Sandoval went to go watch the hospital video, while Officer Watson and Jesse remained waiting in the hallway.  Jesse asked Officer Watson to call his probation officer, Melissa Hardy, because she would know about his mental health problems; Watson asked Jesse if he knew her phone number, but he did not. (Doc. 152, Ex. 4, Video 51:35–51:55.)  But then Jesse stated he thought his probation officer's number was in his bag on the chair. (*Id.* 52:28–52:40, *see id.* 55:31.)  Officer Watson did not check Jesse's bag. (*See id.*)

The medical records show that another Columbia Suicide Risk Assessment was purportedly conducted at 8:09 p.m. (Doc. 155-1 at 32.)  A nurse documented that Jesse answered "yes" to the first question—have you wished you were dead or you could go to sleep and never wake up—and "no" to the remaining questions. (*Id.*)  The space for documenting the assessed suicide risk level is blank. (*Id.*)

But the video evidence shows that, at this time, there was no risk assessment conducted, and no hospital staff questioned Jesse about his mental health. (*See* Doc. 152, Ex. 4, Video 55:00–58:00.)  During the entire video of Jesse at the hospital, no such assessment was ever done. (*See id.* 00:01–1:22:30.)

Finally, at 8:35 p.m., Defendant Officer Watson placed Jesse in the back of his police truck, and they headed to Bullhead City Police Station. (*Id.* 1:22:30–1:24:05.)  During the drive, Jesse asked Officer Watson to take him to the crisis center, but Watson said "no, you're going to have to go to Kingman tonight." (*Id.* 1:27:04–1:27:16.)

At the police station, Defendant Officer Watson removed Jesse's handcuffs, and Jesse was booked by Watson and Sandoval. (*Id.* 1:35:00–1:39:00.) Jesse again asked Officer Watson to contact his probation officer, but Watson said Jesse would see a judge. (*Id.* 1:38:58–1:39:19.) Officer Watson then shared that he empathized with Jesse's situation because the Arizona justice system is "shit" and that the system failed his son, who ended up committing suicide as a result. (*Id.* 1:39:40–1:39:59.) At one point, Jesse asked Officer Watson to throw his jewelry and property away, but Watson explained that they had to book it into property and Jesse could figure out what to do with it later. (*Id.* 1:42:11–1:42:44.) At 9:08 p.m., Officer Watson had to go out on another call, so he gave Jesse a "blanket," which was a paper sheet, and placed him in a holding cell. (*Id.* 1:55:41–1:57:04.) Jesse still wore only his boxer shorts. (*Id.*) Officer Watson directed Officer Sandoval to do cell checks until Jesse was out of there. (*Id.* 1:57:02–1:57:05.) Under Bullhead City Police Department policy, monitoring checks are to be done in person every 15 minutes. (Doc. 148 ¶ 45; Doc. 161 at 8 ¶ 45; Doc. 148-1 at 82, Sandoval Dep. 41:13–22.)

Jesse was in the holding cell for approximately 19 minutes. (Doc. 152, Ex. 11, Video.) During this time, Jesse was swaying and pacing; he repeatedly hit himself; and he appeared to hold a conversation—at times animated and threatening—with someone who was not there. (*See id.* 9:24–11:15, 16:00–18:12.) Defendant Officer Sandoval did not conduct any in-person cell checks while Jesse was in the holding cell. (*See id.*, Video; Doc. 161 ¶ 83.) Officer Sandoval periodically observed Jesse on a monitor while she worked on her booking. (Doc. 148 ¶ 65; Doc. 161 at 10 ¶¶ 65; *id.* at 28 84–85.) Officer Sandoval's booking duties included writing out, or inventorying, all of Jesse's property, which included his bag with the Southwest Behavioral mental health documents. (Doc. 148-1 at 84, Sandoval Dep. 46:2–6; Doc 161 ¶ 71.) This booking paperwork had to be completed before Jesse was transferred. (*Id.* 46:20–24.)

At 9:37 p.m., Transport Officer Menendez arrived and began collecting paperwork in the booking area. (Doc. 152, Ex. 10, Video 35:48–35:60.) Officers Jiminez and Morales

- 9 -

arrived to the booking area a few minutes later to shackle Jesse and escort him to the transport van. (*Id.* 40:12–40:15.) Defendant Officer Sandoval told the Officers that Jesse had been acting crazy and talking to himself. (*Id.* 40:12–40:30.) Officer Menendez asked, "is he a problem?" and Sandoval responded, "yes.  Well, he was." (*Id.* 40:47–52.) Menendez then stated he would call the jail and give them a heads up. (*Id.* 40:52–40:55.)

Officers Jiminez and Morales went to the cell to get Jesse; Jesse was docile and cooperative, and he followed the officers' directions while they shackled his wrists and ankles, brought him out to the booking area, and escorted him to the transportation van. (*Id.* 43:20–46:40; Doc. 148 ¶¶ 70–72, 77.)  Jesse did not display any behavior or make statements indicating that he was a danger to himself or others. (Doc. 148 ¶¶ 78–79; Doc. 161 at 12 ¶¶ 78–79.)

Transport Officer Menendez testified that, when the officers brought Jesse out to the van, Jesse was "a little unruly . . . mouthy, threatening.  That's why I called ahead for a welcoming committee." (Doc. 161-5 at 23, Menendez Dep. 21:7–18.)  Menendez also testified that Jesse initially balked at entering the van, but the officers talked him into entering the van, but he did so slowly and after unnecessarily turning different ways. (*Id.* 21:17–22:02.)

The video does not corroborate Menendez's testimony.  When Jesse arrived at the back of the transportation van, he remained docile and cooperative as he stepped up and crouched down to back up into the back compartment of the van, without any turning or talking. (Doc. 152, Ex. 15, Video 1:53–2:16.)  Officers did not apply any type of seat belt; Jesse remained in handcuffs and leg shackles with the lose chain in front of him. (*Id.* 2:14–2:23.)

The transportation van did not allow for the transport officer, while driving, to perform visual checks on Jesse while he was in the compartment at the back of the van. (Doc. 161 at 34 ¶ 122.)  Transport Officer Menendez explained that the driver cannot really hear anything with the noise of the tires, but he was able to hear Jesse's chains rattle, and at one point Jesse moved toward the front of the compartment because Menendez heard

Jesse ask that the air conditioning be turned on and the lights be turned off. (Doc. 161-5 at 24, Menendez Dep. 22:13–23:4.) Menendez testified that he then heard Jesse's chains and heard Jesse "scuffle along the seat," which was the last thing he heard. (*Id.* 23:9–12; 24:14–21.)

When the transportation van arrived at the Mohave County Jail, Jesse was found unresponsive with his feet near his head. (Doc. 148 ¶ 88; Doc. 161 at 13 ¶ 88.) Jesse appeared to be crouched down in a fetal position as if sitting on his heels, when one officer suddenly yelled that the chain was around his neck. (Doc. 161-5 at 33, Menendez Dep. 31:19–32:12.) The receiving officers instantly pulled Jesse out of the van, put him on the ground, and started CPR. (*Id.* 33:9–34:12.) Other officers called 9-1-1, the fire department and an ambulance arrived, and about 1.5 hours later, Jesse was declared dead. (*Id.* 34:20–)[4] Plaintiff Dale Gardner, on behalf of himself and as personal representative on behalf of Jesse Gardner, brought this action against multiple Defendants. (Doc. 62.) Plaintiff asserted the following claims: Fourteenth Amendment claim against Police Defendants (Count One); 42 U.S.C. § 1983 wrongful death claim against all Bullhead City Police Department Defendants (Count Two); Fourteenth Amendment familial relationships claim against all Bullhead City Defendants (Count Three); state law wrongful death claim against all Defendants (Count Four); § 1983 *Monell* claim against City of Bullhead and Bullhead City Police Department (Count Five); § 1983 *Monell* failure to train/supervise claim

[4] Bullhead City Defendants' separately filed "Response and Objections to Plaintiff's Separate Statement of Additional Facts" is not permitted under the Local Rules. *Hunton v. Am. Zurich Ins. Co.*, No. CV-16 -00539-PHX-DLR, 2018 WL 1182552, at *5 (D. Ariz. March 7, 2018). "LRCiv 56.1(d), which permits the moving party to file a reply memorandum, does not permit the moving party to file a separate responsive memorandum to any additional facts in the non-moving party's separate statement of facts." *Marceau v. Int'l Broth. of Elec. Workers*, 618 F. Supp. 2d 1127, 1141 (D. Ariz. 2009). "Should a moving party have any objections or replies to arguments or facts made in the Response or its supporting statement of facts, these '. . . must be included in the responding party's reply memorandum for the underlying motion and may not be presented in a separate responsive memorandum.'" *E.E.O.C. v. AutoZone, Inc.*, No. 06-CV-0926-PHX-SMM, 2008 WL 2509302, at *1 (D. Ariz. June 18, 2008) (quoting LRCiv. 7.2(m)(2); *see Marceau*, 618 F. Supp. 2d at 1141 ("LRCiv 7.2(m)(2) requires that any response to the objection must be included in the responding party's reply memorandum for the underlying motion and may not be presented in a separate responsive memorandum") (internal quotation omitted). It, thus, will not be considered.

- 11 -

against City of Bullhead and Bullhead City Police Department (Count Six); state law gross negligence claim against Police Defendants (Count Seven); state law malpractice claim against Dr. Treiman (Count Eight); and state law vicarious liability claim against WARMC, Bullhead City Hospital Corporation, and Tempe Emergency Physicians (Count Nine). (*Id.* at ¶¶ 92–146.)

## II.      Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.,* 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must

believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Medical Defendants' Motion for Summary Judgment (Doc. 142)

### A. Expert Witness Requirement Under Arizona Revised Statutes § 12-2604

Under Arizona law, in medical negligence cases, the standard of care must be established by expert medical testimony. *Id.* (quoting *Seisinger*, 203 P.3d at 492 (citations omitted)). Arizona Revised Statutes § 12-2604 establishes the criteria a person must meet to be permitted to give expert testimony on the appropriate standard of care in an action alleging medical malpractice. The statute provides:

> A. In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and the person meets the following criteria:
>
> 1. If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty or claimed specialty as the party against whom or on whose behalf the testimony is offered. If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist who is board certified, the expert witness shall be a specialist who is board certified in that specialty or claimed specialty.
>
> 2. During the year immediately preceding the occurrence giving rise to the lawsuit, devoted a majority of the person's professional time to either or both of the following:
>
> (a) The active clinical practice of the same health profession as the defendant and, if the defendant is or claims to be a specialist, in the same specialty or claimed specialty.
>
> (b) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession as the defendant and, if the defendant is or claims to be a specialist, in an accredited health

professional school or accredited residency or clinical research program in the same specialty or claimed specialty.

Ariz. Rev. Stat. § 12-2604; *see Massara v. United States*, No. CV-13-00269-TUC-BPV, 2014 WL 12527303, at *2 (D. Ariz. Sept. 9, 2014) (citing Ariz. Rev. Stat. § 12-2604(A)(1), (A)(2)(a)).   In his deposition Dr. Tamkin testified that, in the year prior to the May 12, 2022 incident, he spent approximately 40 hours per month in active clinical practice at Mercy Medical Center.  (Doc. 155 Ex. F, Tamkin Dep. 21:15–22.)  He testified that he spent approximately 10 hours per month training first responders and giving paramedic training as the statewide Medical Director for the California Highway Patrol.  (*Id.* 23:13–21.)  He also testified that he spent approximately 20 hours per month as an executive with US Acute Care Solutions, a staffing company that staffs ERs around the country.  In his role at US Acute Care Solutions, he taught leadership development, risk management, and provided other development training of ER professionals.  (*Id.* 26:22–29:1.)  He also testified that he spent about 10 hours per month doing expert witness work.  (*Id.* 29:9–11.)

Plaintiff does not show that Dr. Tamkin's paramedic training of cadets and officers with the California Highway Patrol meets the requirement of § 12-2604(2)(b).   The instruction of students must be "in the same health profession as the defendant."  Ariz. Rev. Stat. § 12-2604(2)(b).  Plaintiff acknowledges that Dr. Tamkin's work with the highway patrol is "teaching a lesser degree of medicine than is expected of ER physicians."  (Doc. 154 at 12; Doc. 155-2 at 8, Tamkin Dep. 22:14–23:6.)  Thus, the hours working with the California Highway Patrol do not count as qualifying professional time to establish Dr. Tamkin's eligibility as an expert in this case.

Nor does Plaintiff show that US Acute Care Solutions qualifies as "an accredited health professional school or accredited residency or clinical research program" as required under subsection (2)(b).  Dr. Tamkin testified that he was a vice president at US Acute Care Solutions and that his role was a management administrative position, and he described US Acute Care Solutions as a staffing company that contracts with hospitals to provide emergency physicians and hospitalists to work in hospitals.  (Doc. 155-2 at 9, Tamkin Dep. 26:25–27:13, 29:3–8.)  Plaintiff makes no showing that this company is

accredited, that it is a school, or that it has a residency or clinical research program. As such, Dr. Tamkin's hours working with US Acute Care Solutions do not count as qualifying professional time to establish Dr. Tamkin's eligibility as an expert in this case.

Consequently, the only hours that count as qualifying professional time are Dr. Tamkin's time spent in active clinical practice at Mercy Medical Center, which he testified is approximately 40 hours per month. *See* Ariz. Rev. Stat. 2604(2)(a). Forty hours a month breaks down to 10 hours a week. Plaintiff's assertion that this constituted 50% of Dr. Tamkin's professional time, and thus a majority of Dr. Tamkin's professional time, suggests that Dr. Tamkin worked part-time.

In *Cutler v. County of Pima*, the plaintiff maintained that his proposed expert satisfied the requirements of § 12-2604 even where the expert worked part-time because it still constituted the majority of the expert's professional time. No. CV-18-00383-TUC-JCH, 2021 WL 2685616, at *6. (D. Ariz. June 30, 2021). The plaintiff argued that "the Arizona legislature did not set an hourly requirement to equate to a 'majority of professional time' and, instead, chose to measure satisfaction of the statutory requirements based on what an expert individually spent the majority of his or her professional time working on." *Id.* The court appeared to accept that argument but noted that, when determining the professional time requirement, courts must consider how much time the expert spent on both qualifying work and non-qualifying work. *Id.*, at *7. For example, in *Zappia v. Sodhi*, the proposed expert spent one day a week working as an intensive care unit nurse and remainder of the week working as a case manager for CIGNA Healthcare and babysitting her grandchildren. No. 1 CA-CV 18-0743, 2020 WL 1026504, at *1–2 (Ariz. Ct. App. March 3, 2020). In *Hardy v. Catholic Healthcare West*, the proposed expert averred that she worked 58 hours a month, and of those 58 hours, 18 were spent engaged in active clinical practice and the remaining 40 hours were spent teaching but not as part of an accredited school or residency or clinical research program. No. 1 CA-CV 09-0890, 2010 WL 5059602, at *4 (Ariz. Ct. App. Dec. 7, 2010).

Here, Plaintiff does not present evidence of how many hours a month Dr. Tamkin worked in the year prior to May 12, 2022, nor did Dr. Tamkin specifically testify that he worked only part-time.  Based on his testimony, 40 hours a month were spent working in the ER and another 40 hours were spent training for the California Highway Patrol, working at US Acute Care Solutions, and doing expert witness work.  But there is no evidence as to how Dr. Tamkin spent the remaining working hours each month and whether he was engaged in other non-qualifying work that would render 40 hours a month in the ER to be less than a majority of his professional time.  Therefore, the record is insufficient for the Court to determine whether Dr. Tamkin satisfies the professional time requirement of § 12-2604(2)(b).  *See Cutler*, 2021 WL 2685616, at *7 (because there was no evidence as to how the proposed expert spent the entirety of his professional time in the year preceding the subject incident, the court could not determine whether the requirements of § 12-2604 were met).

At any rate, Arizona Courts "consider dictionary definitions where a statute does not define a term."  *Shepherd v. Costco Wholesale Corp.* 250 Ariz/ 511 ¶ 20, 482 P.3d 390 (2021); *see also* A.R.S. § 1-213 ("Words and phrases shall be construed according to the common and approved use of the language.").  A majority is "the number greater than half of any total", Black's Law Dictionary (12th ed. 2024) at 1140.  Thus, even assuming Dr. Tamkin spent 50% of his professional time practicing emergency medicine at Mercy Medical Center, that still did not amount to "a majority" Of his time.

Plaintiff fails to meet his burden to establish that Dr. Tamkin is qualified under § 12-2604 to provide expert testimony on the standard of care in this case.  Absent the required expert testimony, Plaintiff's medical negligence claim against Defendants Dr. Treiman, Vasqeuz, and Tempe Emergency Physicians fails as a matter of law.  *See id.*, at *1 (if the plaintiff's proposed expert fails to meet the requirements of § 12-2604 governing qualifications of expert witnesses, the plaintiff's medical negligence claim against the certified paramedic and his employer, Rural Metro, fails as a matter of law).  Accordingly,

the medical negligence claim against Defendant Dr. Treiman is dismissed without prejudice.

## IV.    Defendant WARMC's Motion for Summary Judgment (Doc. 145)

The Court does not reach the question of whether Dr. Treiman was an apparent agent of WARMC because the underlying medical negligence claim against Dr. Treiman fails, so there is nothing for which WARMC can be vicariously liable. *See Ford v. Revlon*, 734 P.2d 580, 584 (Ariz. 1987) ("when the master's liability is based solely on the negligence of his servant, a judgment in favor of the servant is a judgment in favor of the master"); *Law v. Verde Valley Med. Ctr.*, 170 P.3d 701, 705 (Ariz. Ct. App. 2007) ("[b]ecause the doctors were, in the eyes of the law, adjudicated to have no liability to Plaintiff, neither did [the hospital] have any vicarious liability to Plaintiff based on the doctors' conduct").

Defendant WARMC's Motion for Summary Judgment is granted.

## V.    Bullhead City Defendants' Motion for Summary Judgment (Doc. 147)

### A.    Count One—Fourteenth Amendment Claim Against Defendants Watson and Sandoval

#### 1.    Legal Standard

"Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees have a right to receive medical treatment while in police custody." *Hyde v. City of Willcox*, 23 F.4th 863, 873 (9th Cir. 2022) (citation omitted). "A heightened suicide risk or an attempted suicide is a serious medical need[ ]" for the purposes of the Fourteenth Amendment right to medical treatment. *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011); *see NeSmith v. Cnty. of San Diego*, No. 15-CV-629, 2019 WL 1326701, at *21 (S.D. Cal. Mar. 25, 2019) ("[t]he Ninth Circuit has held that a suicide risk or an attempted suicide is a serious medical need") (citing *Conn*, 591 F.3d at 1095).

Under Ninth Circuit law, "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth

Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)).  Under this standard, a plaintiff must show that the denial, delay, or otherwise unreasonable course of medical care was taken in "reckless disregard" of an excessive risk to the plaintiff's health or safety.  *Id.* at 1125.  Unlike in the Eighth Amendment context, where a showing of subjective deliberate indifference is required, a plaintiff need not show subjective intent.  *Id.* at 1125.

The Supreme Court has cautioned that the objective reasonableness standard cannot be applied "mechanically."  *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  Rather, the court must examine the "facts and circumstances of each particular case" through the lens of a reasonable officer and refrain from invoking the "20/20 vision of hindsight."  *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The elements of a pretrial detainee's medical care claim against an individual defendant are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (ii) those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (iii) the defendant did not take reasonable available measures to abate the risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125 (quoting *Castro*, 833 F.3d at 1071).

### 2.    Discussion

The "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused the constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633–34 (9th Cir. 1988).  Therefore, the Court analyzes the liability of each Defendant separately.

### a. Defendant Watson

There is no dispute that Defendant Watson made the intentional decisions to arrest Jesse, take him to the police station, and not to take Jesse to a crisis center when Jesse asked. Thus, the first *Gordon* element is met. *See Castro*, 833 F.3d at 1070 (noting that this first element would not be satisfied only if the defendant's conduct resulted from something totally unintentional, such as an accident).

"[T]he 'substantial risk of serious harm' prong [i]s met if there was a 'serious medical need,' such that a 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022) (quoting *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014)). This element is a purely objective standard and includes the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Id.* (quoting *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014)).

Bullhead City Defendants argue that Dr. Treiman medically cleared Jesse for custody and advised Defendant Watson that Jesse was not an imminent suicide risk, and it was reasonable for Watson to rely on Dr. Treiman's medical determinations. (Doc. 147 at 8.) They further argue that Jesse's behavior and statements to Watson thereafter did not establish any new basis for Watson to determine that Jesse was an imminent suicide risk because Jesse did not make any statement that he would imminently harm himself or others; therefore, this second prong is not met. (Doc. 147 at 8.)

In Response, Plaintiff relies on the expert report of David T. Sweeney, a former Watch Commander for the Seattle Police Department with 35 years of police experience. (Doc. 161-6 at 38.) Sweeney opines that Defendant Watson should have, but failed, to consider facts made known to him at the hospital about Jesse; namely, that Jesse had attempted suicide by jumping off the Laughlin Bridge, that he was at the hospital for evaluation, that he was bi-polar and had not slept for 5 days, that he was a transient, and

that Jesse made comments that he needed to go to an inpatient crisis facility. (*Id.* at 41.) Sweeney opined that, instead of focusing on criminal charges, Defendant Watson should have asked Jesse more questions about his background, family information, prior hospitalizations, any medications prescribed for his mental health, and whether he intended to kill himself. (*Id.* at 42.) Sweeney further opined that the proper standard of care would have been to take Jesse to a mental health facility. (*Id.* at 43.)

But Defendant Watson encountered Jesse at the hospital, where medical personnel had already evaluated Jesse. Sweeney puts the onus on nonmedical police officers to determine Jesse's mental health status despite a medical professional having just informed Watson that Jesse was not a suicide risk and he could be released into custody. While a review of the medical records and the record in this case may raise questions regarding Dr. Treiman's medical determination, Watson was not privy to those records and did not have the hindsight the parties and the experts had later. Watson testified that Dr. Treiman told him Jesse was not suicidal, and that "nothing up until the point that we left the hospital and Dr. Treiman signed his clearance led [Dr. Treiman] to believe, as far as I'm aware, that there was any concern." (Doc. 148-1 at 65, Watson Dep. 94:10–24.) Watson was only aware that Jesse had been at the hospital for many hours and was evaluated by a physician, who determined that Jesse was not a suicide risk.

Courts, including this one, have held that non-medical personnel are entitled to rely on the opinions and determinations of medical personnel pertaining to the medical treatment of detainees and prisoners. *Luster v Pima Cnty.*, No. CV-22-00519-TUC-RM, 2024 WL 4554026, at *4 (D. Ariz. Sept. 27, 2024) (in case brought by a jail detainee, recognizing that "[n]on-medical personnel may rely on the medical opinions of health care professionals unless 'they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner'") (quoting *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013)); *see Haynes v. Snyder*, 546 F.3d 516, 518–20 (7th Cir. 2008) (explaining that lay officers are entitled to rely on the judgment of medical professionals); *Caplinger v. CCA*, 999 F. Supp. 2d 1203, 1214 (D. Idaho 2014) (non-

medical personnel are generally entitled to rely on the opinions of medical professionals with respect to medical treatment of an inmate); *Barber v. Santa Barbara Cnty.*, No. CV 11-2365-DMG (MLG), 2011 WL 6951838, at *6 (C.D. Cal. Nov. 14, 2011) (no deliberate indifference where non-medical officers relied upon the judgments of the examing physicians). "This remains true even when an inmate is in obvious distress and even when the medical staff has misdiagnosed an inmate—or worse, accused him of faking a very real illness." *McGee v. Parsano*, 55 F.4th 563, 573 (7th Cir. 2022). But nonmedical officers may be found deliberately indifferent if "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (quotation omitted); *see Luster*, 2024 WL 4554026, at *4.

Because Defendant Watson was entitled to rely on Dr. Treiman's medical determination that Jesse was not a suicide risk, Plaintiff cannot meet the substantial risk of serious harm prong. Jesse's comments to Watson—that he had been suicidal a few times that week, that he guessed he was suicidal and needed to go to an inpatient facility, and his request to be taken to a crisis center—are not enough to overcome Watson's reasonable reliance on Dr. Treiman's determination that Jesse was not suicidal. *See Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (because inmates request to see crisis counselors for a variety of reasons, including to manipulate staff, "a request to see a crisis counselor, standing alone, is not sufficient to put a defendant on notice that an inmate poses a substantial and imminent risk of suicide"). Waston had no reason to believe that Dr. Treiman and medical personnel at the hospital were mistreating or not treating Jesse. Further, during the majority of Watson's time with Jesse, Jesse was conversational andmild mannered. (Doc. 152, Ex. 4, Video 53:00–53:45.) As a non-medical officer who was just informed by a medical professional that Jesse was not a suicide risk, Watson was not expected to determine from Jesse's statements and demeanor that he was at a substantial risk for suicide and override Dr. Treiman's determination, nor was he constitutionally obligated to do so. *See McGee*, 55 F.4th at 573 ("officers are not constitutionally obligated

- 21 -

to override the judgment of medical professionals"); *see also Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) ("[s]uicide is a difficult event to predict and prevent and often occurs without warning. Both the common law and recently developed constitutional law applying to those in custody have taken this uncertainty into account"); *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) ("[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting").

Based on the above, Officer Watson cannot be liable under the Fourteenth Amendment, and Bullhead City Defendants' Motion for Summary Judgment is granted as to the claim in Count One against Watson.

### b.     Defendant Sandoval

There is no dispute that Defendant Sandoval made the intentional decisions to take no extra or special action in response to Jesse's conduct in the holding cell and to make no mention to the transport officer that Jesse had jumped off the Laughlin Bridge earlier that day.

The substantial risk of serious harm prong examines whether Jesse's conduct in the holding cell put Defendant Sandoval on notice of a substantial risk of suicide. Plaintiff's expert, Sweeney, opined that any officer observing Jesse's conduct—hitting himself in the head, talking to the wall and bench, shouting and gesturing—should have realized that these behaviors, combined with Jesse's prior report to Defendant Officers that he was bi-polar, paranoid, and depressed, established a need to get Jesse mental health help rather than book him into jail. (Doc. 161-6 at 45.)

As discussed above, Sandoval was entitled to rely on Dr. Treiman's medical determination that Jesse was not a suicide risk. The fact that, following Dr. Treiman's determination, Jesse was talking to himself, hitting himself, doing pushups, and acting erratically is not enough to provide notice of a substantial risk of suicide. *See Jackson v. West*, 787 F.3d 1345, 1354 (11th Cir. 2015) ("'[a]nti-social, aggressive behavioral problems' do not rise to the level of a strong risk of suicide"); *Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) ("strange behavior alone,

without indications that that behavior has a substantial likelihood of taking a suicidal turn, is not sufficient to impute subjective knowledge of a high suicide risk to jail personnel"); *see also Carvell on behalf of H.A.A.W. v Gibson*, No. 23-30252, 2024 WL 4533312, at *6 (5th Cir. Oct. 21, 2024) ("[e]ven if Misty behaved 'erratically' by resisting arrest, lying about a pregnancy, and faking seizures, that is not enough under this court's precedent to suggest that [jail] officials had subjective knowledge that she was at a heightened risk of suicide").  None of Jesse's actions in the holding cell indicated an intent to harm himself such that Sandoval was on notice of a substantial risk of suicide.

Absent evidence of a substantial risk of suicide, Defendant Sandoval's failure to specifically mention to the transport officer that Jesse had jumped off the Laughlin Bridge earlier that day does not give rise to any liability.  The video evidence shows that Sandoval told the transport officer that Jesse had been acting crazy and talking to himself, and that he had been a problem earlier.  (Doc. 152, Ex. 10, Video 40:12–40:52.)  Sandoval's failure to provide any further detailed information did not create a substantial risk of harm for which the consequences of taking no further action were obvious.

Plaintiff argues that Defendant Sandoval failed to keep a proper custody log and fill out the booking paperwork correctly, and, had she done so, it "would have likely put a reasonable Transport Officer on alert to keep a constant watch on Jesse, instead of transporting him to the Mohave County Jail with no direct visual observation and very poor audio observation for over an hour."  (Doc. 159 at 18.)  Nevertheless, the video evidence shows that the Transport Officer collected the booking paperwork and put it in a notebook but did not read through it.  (Doc. 152, Ex. 10, Video 39:09–39:30.)  The Transport Officer testified that he only checks the booking packet to ensure it includes the booking, the "PC," the medical records if necessary, and an inventory list; however, he only gives a cursory look at the papers and does not review them in any detail.  (Doc. 161-5 at 42, Menendez Dep. 40:2–17.)  Thus, even if the booking paperwork was filled out correctly, the Transport Officer did not read it.

For the above reasons, Defendant Sandoval cannot be liable under the Fourteenth Amendment. Bullhead City Defendants' Motion for Summary Judgment will be granted as to the claim against Sandoval in Count One.

### B.    Count Two—§ 1983 Wrongful Death Claim Against All Bullhead City Defendants

#### 1.    Defendants Watson and Sandoval

The Court construes Plaintiff's § 1983 wrongful death claim against Defendants Watson and Sandoval as a claim under the Fourteenth Amendment, which is redundant of the claim against these Defendants in Count One. (*See* Doc. 62 ¶¶ 100–103.)[5] *See Smith v. City of Fontana*, 818 F.2d 1411, 141617 (9th Cir. 1987) (analyzing the survivor action under the Fourteenth Amendment); *Arres v. City of Frenso*, No. CV F 10-1628 LJO SMS, 2011 WL 284971, at *12–13 (E.D. Cal. Jan. 26, 2011) (explaining that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process[,]" and therefore the court construed the Plaintiff's § 1983 wrongful death claim as one under the Fourth Amendment and found that it was redundant of the complaint's § 1983 Fourth Amendment excessive force claim). The Court has determined that Watson and Sandoval cannot be liable under the Fourteenth Amendment; thus, Watson and Sandoval cannot be liable for wrongful death under § 1983. Summary judgment will be granted on the wrongful death claim against Watson and Sandoval in Count Two.

#### 2.    Defendant Bullhead City

In the Second Amended Complaint, Plaintiff alleged that liability for the § 1983 wrongful death claim was based on the conduct of Defendants Watson and Sandoval. (Doc. 62 ¶¶ 101, 103.) The Court has determined that Watson and Sandoval are not liable for wrongful death under § 1983 because there was no underlying Fourteenth Amendment

---

[5] In the Response, Plaintiff does not distinguish the § 1983 wrongful death claim in Count One from the Fourteenth Amendment claim in Count Two. (*See* Doc. 159.)

violation; therefore, the City cannot be liable.  *See Conde v. City of Atlantic* City, 293 F. Supp. 3d 493, 508 (D.N.J. 2017) (a § 1983 wrongful death claim is predicated upon an underlying constitutional violation).  Summary judgment will be granted on the wrongful death claim against the City in Count Two.

### C.  Count Three—Fourteenth Amendment Deprivation of Family Relationship Claim Against all Bullhead City Defendants

#### 1.  Legal Standard

"A parent has a constitutionally protected liberty interest in the companionship and society of his or her child."  *Kelson v. City of Springfield*, 767 F.2d 651, 655 (9th Cir. 1985).  A violation of the right to family integrity is subject to remedy under § 1983.  *Id.* To amount to a violation of substantive due process, the harmful conduct must "shock [ ] the conscience" or "offend the community's sense of fair play and decency."  *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) (quoting *Rochin v. Cal.*, 342 U.S. 165, 172–73 (1952)).  Typically, only "conduct intended to injure in some way unjustifiable by any government interest" will "rise to the conscience-shocking level" necessary to violate substantive due process.  *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

Where the officer had time for actual deliberation, or time to correct his or her actions, a plaintiff must show the officer "acted with deliberate indifference."  *Porter v. Osborn*, 546 F.3d 1131, 1137–38 (9th Cir. 2008); *see Whitley v. Albers*, 475 U.S. 312, 320 (1986) (applying deliberate indifference standard to custodial prison conditions); *Lee v. City of Los Angeles*, 250 F.3d 668, 684 (9th Cir. 2001) (applying deliberate indifference standard to a wrongful incarceration).  If the officer did not have time for deliberation and "faced an evolving set of circumstances that took place over a short time period necessitating 'fast action,'" a plaintiff must make a higher showing that the officer "acted with a purpose to harm."  *Porter*, 546 F.3d at 1137–38.

#### 2.  Discussion

Plaintiff's allegations against Defendants Watson and Sandoval do not relate to

split-second decisions they made without time for deliberation. Rather, both Defendants had time for actual deliberation with regard to the actions they took during their interactions with Jesse during the arrest, booking, and detention of Jesse. Plaintiff must therefore show that each officer acted with deliberate indifference. *Id.* The Court has already conducted the deliberate indifference analysis in Count One and found that neither Defendant was deliberately indifferent. Accordingly, summary judgment will be granted as to the claims in Count Three against Watson and Sandoval.

For a loss of familial relationship claim to be actionable, the claim "must be based on underlying wrongful governmental conduct that amounts to a constitutional deprivation." *Corales v. Bennett*, 488 F. Supp. 2d 975, 986 (C.D. Cal. 2007). Plaintiff's claim in Count Three against Defendant Bullhead City is based on the alleged unconstitutional conduct by Defendants Watson and Sandoval. (Doc. 62 ¶¶ 6, 105–106.) Because the Court has found that Watson and Sandoval were not deliberately indifferent in violation of the Fourteenth Amendment, there is no underlying, dependent constitutional violation to support the loss of familial relationship claim against the City. *See Corales*, 488 F. Supp. 2d at 986; *see also Corales v. Bennett*, 567 F.3d 554, 569 n.11 (9th Cir. 2009) ("Plaintiffs' family relations substantive due process claim also fails, as there is no underlying dependent constitutional violation"). The Court will grant summary judgment on the claim in Count Three against Bullhead City.

**D.      Counts Five and Six—*Monell* Claims Against Defendant Bullhead City**

Plaintiff advances two different theories of *Monell* liability: (1) a lack of a policy directing officers to shackle detainees with a belly belt and to visually monitor detainees during transport, and (2) a failure to train/supervise officers on how to properly assess and manage detainees who have serious mental health concerns. (Doc. 62 ¶¶ 113–121.)

**1.      Lack of Policy**

A governmental entity may be liable under *Monell* where its policy causes a constitutional violation through an employee's "inaction or omission," and "may be based on failure to implement procedural safeguards to prevent constitutional violations." *Tsao*

*v. Desert Palace, Inc.*, 698 F.3d 1128, 1144 (9th Cir. 2012).  To prevail on a lack-of-policy theory under *Monell*, a plaintiff must show (1) the deprivation of a constitutional right, (2) that the entity's policy, or lack thereof, amounts to deliberate indifference to the constitutional right, and (3) that the policy caused the violation such that the entity could have prevented the violation with an appropriate policy.  *Id.* at 1143.

### a.    Deprivation of Constitutional Right

Plaintiff alleged that Defendant Bullhead City has a long-standing practice or custom of transporting detainees in the back of transportation vans that lack adequate visual surveillance and audio monitoring, and without proper restraint measures to ensure detainees' safety, and that this practice is deliberately indifferent to a substantial risk of serious harm to detainees transported in the back of transportation vans. (Doc. 62 ¶¶ 115–116.)  These allegations support an alleged Fourteenth Amendment violation.  *See Castro*, 833 F.3d at 1067 (detainees have a Fourteenth Amendment right to be protected from harm).

Defendant Bullhead City does not address Plaintiff's allegation that failing to conduct any security checks or monitoring of detainees confined in an enclosed compartment in the back of a van during transport, where the transport lasts up to 50 minutes, amounts to deliberate indifference.  (*See* Docs. 147, 169.)  The Ninth Circuit has held that, with respect to detention in cells, detainees "have a right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment."  *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021); *see Estate of Abdollahi v. Cnty. of Sacramento*, 405 F. Supp. 2d 1194, 1206–07 (E.D. Cal. 2005) (denying county's summary judgment motion where a reasonable jury could find the jail's failure to conduct regular safety checks posed a substantial risk to inmates).

In short, Defendants do not provide any argument or evidence regarding whether Jesse was deprived of his Fourteenth Amendment rights when he was transported in a compartment in the back of a transportation van without visual checks or any monitoring devices.  Consequently, there exists a genuine issue of material fact as to the first *Monell*

factor. *See TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 802, 815 (C.D. Cal. 2010) ("[b]y failing to squarely address [Plaintiffs'] theory, the Defendants have not carried their initial *Celotex* burden").

### b.   Deliberately Indifferent Policy or Lack Thereof

Defendants do not address whether there was a policy or practice regarding security checks or monitoring of detainees during transport, but the undisputed evidence shows that the transportation van had enclosed compartments in the back with no video or audio monitoring capabilities. Plaintiff submits evidence that, immediately after Jesse's death, Defendant Bullhead City implemented a policy to transport all detainees in the front compartment of the transportation van so they could be observed visually and audibly. (Doc. 161 ¶ 127; Doc. 161-4 at 151, Jimenez Dep. 33:25–34:5; Doc. 161-5 at 62, Trebes Dep. 14:19–23.) Plaintiff's evidence supports that, at the relevant time, there was no policy or practice regarding safety checks or monitoring of detainees during transport. *Conn*, 591 F.3d at 1104; *Henry*, 132 F.3d at 520.

Defendant Bullhead City does not directly address why the lack of a policy to visually monitor detainees during transport would not constitute deliberate indifference. Instead, Bullhead City conclusorily asserts that "its policy involving use of shackles and the transport van was not deliberately indifferent." (Doc. 147 at 10.)

Plaintiff submits evidence to show that, the day after Jesse's death, Defendant Bullhead City implemented a standard practice to shackle all detainees with a belly belt during transport. (Doc. 161 ¶¶ 126–127; Doc. 161-4 at 28, Watson Dep. 67:19–68:6; *id.* at 151, Jimenez Dep. 33:5–12.) Evidence showing a new policy is implemented post-event is admissible to show the absence of an earlier policy or practice. *Conn*, 591 F.3d at 1104; *Henry v. Cnty. of Shasta*, 132 F.3d 512, 520 (9th Cir. 1997).

Notably, Defendant Bullhead City had a policy to monitor detainees in holding cells via cameras and to conduct in person cell checks every 15 minutes. (*See* Doc. 148 ¶ 45; Doc. 161 ¶ 45; Doc. 148-1 at 83, Sandoval Dep. 41:13–22.) Also, instead of a cloth sheet or blanket, Jesse was given a paper sheet when he entered the holding cell. *See McMahon*

*v. Beard*, 583 F.2d 172, 175 (5th Cir. 1978) ("[r]emoval of all cloth which might offer a means for suicide would seem prudent"); *Cagle v. Sutherland*, 334 F.3d 980, 989 (11th Cir. 2003) (noting that "cell had been stripped of implements that might assist suicide"). These facts would allow a jury to infer that Defendant Bullhead City appreciated the risk of self-harm by detainees and took precautions to alleviate that risk in the cells.

There is no evidence that the risk of self-harm dissipates when a detainee is moved from a holding cell to a compartment in the back of a transportation van. Plaintiff's evidence that, after Jesse's death, Bullhead City immediately implemented polices for detainees to be shackled with belly belts and placed in that part of transportation vans where they can be observed and heard, supports the feasibility of such measures to ensure detainees' safety. *See* Fed. R. Civ. P. 407 (evidence of subsequent measures is not admissible to show negligence or culpable conduct; however, evidence of subsequent remedial measures is admissible to show the feasibility of precautionary measures). Despite the risk of self-harm, Bullhead City placed Jesse in an isolated compartment, with no means to monitor him, and with loose shackle chains that he was able to use to harm himself.

On this record, a reasonable jury could find that Defendant Bullhead City could have prevented Jesse's suicide with an appropriate transport policy.

In light of the above, the Motion for Summary Judgment will be denied as to the *Monell* lack of policy claim in Count Five against Defendant Bullhead City.

### 2. Failure to Train/Supervise

Plaintiff alleged that Defendant Bullhead City failed to adequately train its officers on how to assess and manage pre-trial detainees who have serious mental health concerns or who present as a potential risk for suicide, but Plaintiff did not specifically assert a failure to train/supervise claim related to the shackling and transport of detainees from Bullhead City Police Station to the Mohave County Jail. (*See* Doc. 62 ¶¶ 118–121.)

In their Motion for Summary Judgment, Defendant Bullhead City argues that the testimony of Defendants Watson and Sandoval and Officers Morales and Jiminez shows

they were properly trained and supervised and that "thousands of prisoners have traveled between the Bullhead City Police Station and the Mohave County Jail with the same shackle system and transport van and they arrived safely without incident." (Doc. 147 at

Yet, Bullhead City fails to address the claim set forth in the Second Amended Complaint. Because Defendant Bullhead City wholly failed to address the failure to train/supervise claim set forth by Plaintiff, they have not met their initial burden, and summary judgment on this claim in Count Six must be denied. *See Nissan Fire*, 210 F.3d at 1102–03; *TYR Sport, Inc.*, 709 F. Supp. 2d at 815.

### E. Counts Four and Seven—State Law Wrongful Death Claim for Negligence Against All Defendants and State Law Gross Negligence Claim Against Defendants Watson and Sandoval

#### 1. Legal Standard

Plaintiff's claim in Count Four is brought under Arizona's wrongful death statute, which states:

> When death of a person is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death was caused under such circumstances as amount in law to murder in the first or second degree or manslaughter.

Ariz. Rev. Stat. § 12-611. A prerequisite for recovery under § 12-611 is the ability of the decedent to have maintained an action if death had not ensued. *Summerfield v. Superior Ct. in and for Maricopa Cnty.*, 698 P.2d 712, 720 (Ariz. 1985).

Under Arizona law, a wrongful death claim must rest on an underlying tort theory; the statute does not itself provide an independent theory of liability. *Harris v. City of Phoenix*, No. CV-20-00078-PHX-DLR, 2021 WL 4942662, at *2 (D. Ariz. Oct. 22, 2021). Under Arizona law, plaintiffs are typically required to show public employees are "grossly negligent" and not merely negligent. *See* Ariz. Rev. Stat. § 12-820.02 (providing qualified

immunity to a public employee acting within the scope of employment unless the public employee "intended to cause injury or was grossly negligent").

To prevail on a negligence claim under Arizona law, a plaintiff must prove: "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007) (internal citations omitted). Additionally, a gross-negligence claim "requires a showing of '[g]ross, willful, or wanton conduct.'" *Noriega v. Town of Miami*, 407 P.3d 92, 98 (Ariz. Ct. App. 2017) (quoting *Armenta v. City of Casa Grande*, 71 P.3d 359, 364 (Ariz. Ct. App. 2003)) (other citation omitted). "A party is grossly or wantonly negligent if he acts or fails to act when he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Walls v. Ariz. Dep't of Pub. Safety*, 826 P.2d 1217, 1221 (Ariz. Ct. App. 1991). "Gross or wanton or willful misconduct negligence is different from ordinary negligence in quality and not degree. A person can be very negligent and still not be guilty of gross negligence." *Kemp v. Pinal Cnty.*, 474 P.2d 840, 843–44 (Ariz. Ct. App. 1970). It is "action or inaction with reckless indifference to the result or the rights or safety of others." *Williams v. Thude*, 885 P.2d 1096, 1104 (Ariz. Ct. App. 1994). "Generally, whether gross negligence occurred is a question of fact for a jury to determine." *Noriega*, 407 P.3d at 101 (explaining "gross negligence need not be established conclusively, but the evidence on the issue must be more than slight and may not border on conjecture") (quoting *Walls*, 826 P.2d at 1221).

### 2.    Discussion

#### a.    Medical Defendants

As it pertains to the Medical Defendants the Court has already determined that there is no medical negligence claim against those Defendants due to Plaintiff's failure to submit qualified expert testimony as statutorily required. It follows that the wrongful death claim

against Medical Defendants also fails, and this claim against Medical Defendants in Count Four will be dismissed without prejudice.

### b.    Bullhead City Defendants

Bullhead City Defendants argue that the wrongful death claim against them is barred by Arizona Revised Statutes § 36-525.  (Doc. 147 at 13.)

Section § 36-525 provides:

> [A] peace officer may take into custody any individual the peace officer has probable cause to believe is, as a result of mental disorder, a danger to self or others, and if during the time necessary to complete the prepetition screening procedures set forth in §§ 36-520 and 36-521 the person is likely without immediate hospitalization to suffer serious physical harm or serious illness or to inflict serious physical harm on another person.  The peace officer shall transport the person to a screening agency unless the person's condition or the agency's location or hours makes such transportation impractical, in which event the person shall be transported to an evaluation agency.  A peace officer is not held civilly liable for any acts committed by a person whom the peace officer has not taken into custody pursuant to this section.

Ariz. Rev. Stat. § 36-525(A).  Bullhead City Defendants rely on the last sentence of this paragraph stating that an officer is not liable for acts committed by someone whom the officer does not take into custody under § 36-525(A).  (Doc. 147 at 13.)

Plaintiff responds that any immunity applies only insofar as Plaintiff may have argued that Defendant Officers should have initiated Title 36 proceedings.  (Doc. 159 at 33.)  Plaintiff maintains that such immunity does not apply to the City for its negligent customs and practices of transporting detainees unsupervised with no monitoring, nor does it apply to Defendant Officers' alleged negligent acts and failures to act when Jesse was in their custody.  (*Id.* at 33–34.)

Jesse was initially taken to the hospital emergency room by officers pursuant to Title 36 (or the Nevada equivalent, "L2K").  Defendant Officers were later called to the hospital for an alleged assault committed by Jesse, and they were informed by the treating physician that Jesse was not suicidal or likely to suffer serious harm.  In Counts Four and Seven,

Plaintiff did not allege that Defendants' negligence or gross negligence was based on the failure to initiate proceedings under Title 36. Thus, § 36-525 immunity is not applicable to the specific facts in this case and the alleged negligence by Bullhead City Defendants.

As to whether Bullhead City Defendants were negligent or grossly negligent, Bullhead City Defendants rely on their arguments put forth in the Fourteenth Amendment deliberate indifference analysis to assert that their conduct did not rise to "wanton" misconduct. (Doc. 147 at 13–14.) Plaintiff, likewise, relies on his prior arguments, arguing that "given the clear deliberate indifference . . . outlined above," there is evidence to support that Bullhead City Defendants were grossly negligent. (Doc. 159 at 34–35.)

Plaintiff specifies the negligent conduct that allegedly support the state law claims against Bullhead City Defendants, including (1) Defendant Watson's negligent disregard of Jesse's admissions that he had been suicidal that week, (2) Watson's negligent failure to relay to Dr. Treiman information about Jesse's intent to kill himself that day, (3) Watson's negligent failure "to truly listen to Jesse and consider" that his case should have been handled as a mental health care issue and not a criminal matter, (4) Watson's negligent failure to order more frequent watches on Jesse, (5) Watson's negligent failure to order transport in a way that allowed for visual observation, (6) Watson's negligent failure to order that Jesse be transported with a belly belt and shackles, (7) Defendant Officers' negligent failure to investigate Jesse's mental health history, (8) Defendant Sandoval's negligent failure to properly do cell checks, (9) Sandoval's negligence in not recognizing Jesse's concerning behavior in the holding cell, (10) Sandoval's negligent failure to fill out all booking paperwork properly, and (11) Defendant Officers' negligent failure to relay Jesse's medical history to the other officers and the transport officer. (Doc. 159 at 33–34.)

Plaintiff fails to show that any of the above actions would support a negligence or personal injury claim brought by Jesse had he not died. *Summerfield*, 698 P.2d at 720. As such, Plaintiff fails to meet the requirement for bringing a wrongful death claim under § 12-611. *See id.*; *Schoenrock v. Cigna Health Plan of Ariz., Inc.*, 715 P.2d 1236, 1237 (Ariz. Ct. App. 1985) (§ 12–611 provides that the right to bring a wrongful death action exists

only when the decedent would have been able to maintain an action for damages "if death had not ensued"). The Court will grant summary judgment on the wrongful death claim against Bullhead City Defendants in Count Four.

Plaintiff also fails to establish gross negligence. "To establish gross negligence, the claimant essentially must show wanton misconduct that is flagrant and evinces a lawless and destructive spirit." *Badia v. City of Casa Grande*, 988 P.2d 134, 141 (Ariz. Ct. App. 1999) (quotation omitted). None of the actions cited by Plaintiff amount to flagrant or wanton conduct or reckless indifference to Jesse's safety in light of facts showing that Defendant Officers Watson and Sandoval took custody of Jesse from the hospital after a physician had confirmed that Jesse was not a suicide risk, and thereafter Jesse did not exhibit such extreme behavior that Defendant Officers were put on notice of a substantial risk of suicide. *See Walls*, 826, P.2d at 1221; *Noriega*, 407 P.3d at 100 ("gross negligence . . . falls closer to [the] recklessness standard" that "usually involves a conscious disregard of a risk"). The opinion of Plaintiff's expert—Sweeney—that Defendant Officers did not act reasonably or take the proper course of action, does not change the conclusion there is no showing of gross negligence. (Doc. 161-6 at 43–45.) "Expert opinions, without more, do not necessarily render a plaintiff's allegations of gross negligence triable issues of fact." *Badia*, 988 P.2d at 142; *see Florez v. Sargeant*, 917 P.2d 250, 255 (Ariz. 1996) (expert "affidavits that only set forth ultimate facts or conclusions of law can neither support nor defeat a motion for summary judgment").

Summary judgment is therefore granted on the gross negligence claims against Defendants Watson and Sandoval in Count Seven. *See Badia*, 988 P.2d at 141 (summary judgment is appropriate "if 'no evidence is introduced that would lead a reasonable person to find gross negligence'") (quoting *Walls*, 826 P.2d at 1221).[6]

_____

[6] Bullhead City Defendants also move to bar Sweeney's opinions for lack of foundation, expertise, and speculation. (Doc. 144.) As set forth above, even when considering Sweeney's opinions, Bullhead City Defendants are entitled to summary judgment as to all claims against them except the § 1983 *Monell* claims in Counts Five and Six. The Court did not consider Sweeney's report in its analysis of the *Monell* claims.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants Tempe Emergency Physicians, Micheal Treiman, and Unknown Treiman's Motion for Summary Judgment (Doc. 142); Defendants Bullhead City Police Department, Bullhead City, Sandoval, and Watson's Motion in Limine (Doc. 144); Defendant Bullhead City Hospital Corporation's Motion for Summary Judgment (Doc. 145); and Defendants Bullhead City, Sandoval, and Watson's Motion for Summary Judgment (Doc. 147).

(2)     Defendants Tempe Emergency Physicians, Treiman, and Vasquez's Motion for Summary Judgment (Doc. 142) is **granted**, and the claims against Tempe Emergency Physicians, Treiman, and Vasquez are **dismissed**.

(3)     Defendants Bullhead City, Sandoval, and Watson's Motion in Limine (Doc. 144) is **denied without prejudice**.

(4)     Defendant Bullhead City Hospital Corporation's Motion for Summary Judgment (Doc. 145) is **granted**, and the claims against Bullhead City Hospital Corporation are **dismissed**.

(5)     Defendants Bullhead City, Sandoval, and Watson's Motion for Summary Judgment (Doc. 147) is **granted in part** and **denied in part** as follows:

(a)     the Motion is **granted** as to Counts One, Two, Three, Four, and Seven, and these Counts are **dismissed**, and the request to dismiss Bullhead City Police Department as a Defendant is **granted**; and

(b)     the Motion is otherwise **denied**.

(6)     Tempe Emergency Physicians, Bullhead City Hospital Corporation, Treiman, Vasquez, Watson, Sandoval, and Bullhead City Police Department are **dismissed** as Defendants.

---

Thus, the Court need not address the Motion in Limine at this time, and it will be denied without prejudice.

(7)     The remaining claims are the *Monell* policy claim against Defendant Bullhead City in Count Five and the *Monell* failure to train/supervise claim against Defendant Bullhead City in Count Six.

(8)     This action is referred to Magistrate Judge Deborah M. Fine to conduct a settlement conference.

(9)     Counsel must arrange a joint call to Magistrate Judge Fine's chambers at (602) 322-7620 within 14 days to schedule a date for the settlement conference.

Dated this 18th day of March, 2026.

_____
G. Murray Snow
Senior United States District Judge